# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 9, 2003

## STATE OF TENNESSEE v. TRENT STARK

### Direct Appeal from the Criminal Court for Shelby County
### No. 01-02374     J. C. McLin, Judge

---

### No. W2002-03078-CCA-R3-CD  - Filed December 5, 2003

---

The appellant, Trent Stark, was convicted by a jury of first degree murder.  As a result, the jury sentenced the appellant to life in prison without the possibility of parole.  The appellant appealed after the denial of a motion for new trial.  The only issue raised on appeal is the sufficiency of the evidence.  We conclude that the evidence was sufficient to support a finding of guilt and therefore affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Garland Ergüden (on appeal) and William Johnson (at trial), Memphis, Tennessee, for the appellant, Trent Stark.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Tavarous Woods, a resident of the Cedar Mills Apartment complex in Memphis, Tennessee, spent the afternoon of October 11, 2000, "hanging out" with the appellant after he got out of school.  Mr. Woods knew the appellant because the appellant's girlfriend lived in the apartment complex.

The appellant, Mr. Woods, and several other individuals spent part of the afternoon and early evening sitting on some apartment steps.  At one point, Darrel Smith, another resident of the complex, walked by the area where the men were sitting.  Mr. Woods noticed that Mr. Smith and the appellant were "just kind of looking at each other real funny."  Sometime later, Mr. Smith again

came by the steps where the group was sitting, this time smoking a Black and Mild cigar. The appellant asked Mr. Smith if he could have a "hit" from the cigar, and Mr. Smith asked the appellant if they knew each other. When the appellant said, "no," Mr. Smith refused and then went home.

Around 9:00 p.m., Mr. Smith walked to the nearby Arby's Restaurant where his fiancee worked to get some food. The appellant and Mr. Woods walked to the Circle K, a convenience store, at around the same time and were on their way back to the apartment complex when they saw Mr. Smith coming out of Arby's. The two walked behind Mr. Smith until he stopped to let them pass. After they passed Mr. Smith, the appellant told Mr. Woods that he was "going [to] get that man." Mr. Woods remembered that the appellant had a 9 mm handgun in his possession that afternoon and evening. When the appellant and Mr. Woods got back to the apartment complex, Mr. Woods shook the appellant's hand, went home, and did not see either the appellant or Mr. Smith again that night.

Andrea Hodges, another resident of Cedar Mills Apartments, left her residence on the evening of October 11, 2000, to pick up her daughter from work. As she left her apartment to walk to her vehicle, she noticed a person walking on the property "who just seemed out of place." She described the person as tall and noticed that he was wearing dark pants and a large black "stadium-type" jacket. As Ms. Hodges drove away from her parking spot towards the exit of the apartment complex, she saw a man who appeared to be drunk. The man staggered and fell in the street. When she noticed that the man did not move after falling, she pulled her car over, directed her headlights toward the area where the man was lying and got out of her car. At that time, she realized that something was wrong and that the man appeared injured. She thought that the man looked familiar, but she could not recall his name.

Once she realized that the man was injured, Ms. Hodges called the police. Looking around the man on the ground, she noticed that there was an "Arby's cup rocking back and forth in the street. There was ice and liquid flowing from the cup. There was [sic] batteries rolling, and the person was just lying there, and [it] seemed like the CD in the [person's] CD player was still spinning." While she did not notice any blood at first, Ms. Hodges later saw blood coming from the man's head. She stated that she "saw him bleeding from his head, and his body started shaking, you know, trembling and stuff, and then he started throwing up, and you know, jerking until his body just died." She did not see a gun anywhere near the body. Ms. Hodges stayed until the police arrived. The victim died at the scene. Ms. Hodges later learned that the man was Darrel Smith, a resident of the apartment complex.

Officer Johnny Lee Byars of the Memphis Police Department was the first officer to arrive at the scene. He arrived within fifteen to thirty seconds of the initial radio call because he was close to the area. When he arrived, he saw Ms. Hodges's car parked in the middle of the road and a body on the ground. He "noticed a young man in a fetal position" who was "still breathing" and had a walkman and headphones on his head. Officer Byars also noticed the spilled Arby's drink. He saw what he thought were two gunshot wounds in the back of the young man's head, but he did not see a gun anywhere around the body.

Sergeant Marcus Berryman, a crime scene officer with the Memphis Police Department arrived at the scene shortly after Officer Byars to document the evidence. He recovered four 9 mm spent shell casings from the scene, but did not recover a weapon.

On October 12, the appellant voluntarily went to the police station to speak with the authorities. Sergeant Nathan Berryman advised the appellant of his rights. The appellant chose to waive his rights and talk to the police. He was interviewed by Sergeant Gene Hulley and another officer. During the course of the interview, the appellant gave a statement in which he admitted that he was responsible for the victim's death. He maintained that he "was walking home from Tavarous' house and . . . [the victim] approached me with a gun, he draw [sic] down on me and ducked and pulled my pistol and shot three times, and I ran, and that was it." When asked whether he and the victim had a disagreement over something, the appellant replied, "It was nothing. I asked him to let me hit his cigar, he said no. Then he walked off." The appellant asserted that he fired his own black 9 mm handgun at the victim and claimed that the victim was armed with a black revolver. The appellant stated that he was wearing a black shirt, black jogging pants, a black jacket with white writing, and black tennis shoes with red shoe strings at the time of the incident. He told the officers that he bought the gun on the street for sixty dollars and that after shooting the victim he threw the gun into the woods.

Mr. Smith's body was examined by Dr. O.C. Smith, the Shelby County Medical Examiner. He testified that the victim sustained three gunshot wounds. One bullet entered the right back of the victim's head, impacting the skull and causing extensive damage to the brain. The bullet exited behind and above the right ear. A second bullet entered the victim's right upper back, fracturing a rib, passing through a lung, passing through another rib, and exiting the front of the body. The third wound was a "flesh wound" to the elbow. Dr. Smith testified that the shots to the head and chest were fatal wounds by themselves, but that the cause of the victim's death was multiple gunshot wounds. Dr. Smith also determined that there were no powder burns on the victim, indicating that the weapon was at least two feet away from the victim's skin when fired. Further, the victim's drug screen was negative, and only a small amount of alcohol, .01%, was found in the victim's blood.

Mr. Smith was last seen by his mother when he left their apartment to walk to the Arby's for chicken sandwiches. Mr. Smith lived at Cedar Mills Apartments with his mother, father, siblings, fiancee, and daughter, but Mr. Smith and his fiancee had signed a lease for their own apartment the morning of October 11. Between 9:00 p.m. and 9:30 p.m. that evening, the apartment manager knocked on the door to the family's apartment and asked Mr. Smith's father to come outside and see if it was indeed his son who was shot.

The appellant was indicted in early 2001 for the October 11, 2000, first degree murder of Darrel Smith, the victim. The State sought the death penalty for the offense. After a jury trial, the jury found the appellant guilty as charged. The penalty phase of the trial began after the verdict of guilt was rendered, and the jury sentenced the appellant to life in prison without the possibility of parole. The appellant filed a timely motion for new trial that was denied by the trial court. The appellant then pursued this appeal, seeking a review of the sufficiency of the evidence.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the instant case, the appellant challenges the sufficiency of the evidence. Specifically, the appellant argues that the evidence does not support a finding of premeditation because there was "no proof of any prior hostility or altercation between . . . [the victim] and the appellant which would have led to an attack seemingly without reason." Further, the appellant argues that the proof does not support a conviction for homicide greater than either murder in the second degree or voluntary manslaughter. The State counters that the evidence presented at trial was sufficient to support a conviction for first degree murder.

Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder in pertinent part as "a premeditated and intentional killing of another." Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Therefore, in order to convict the appellant of his indicted offense, the State was required to prove beyond a reasonable doubt that the defendant killed the victim with "premeditation." "[W]hether premeditation is present is a question of fact for the jury, and it may

be inferred from the circumstances surrounding the" commission of the crime. State v. Billy Gene Debow, Sr., No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *4 (Tenn. Crim. App. at Nashville, Aug. 2, 2000); see also State v. Jerry Ray Davidson, No. M1998-00105-SC-DDT-DD, 2003 WL 22398392, at *10 (Tenn. Oct. 20, 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. State v. Jerry Ray Davidson, 2003 WL 22398392, at *10; Bland, 958 S.W.2d at 660; see also State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992).

After a thorough review of the record, we find that there was sufficient evidence introduced at trial to support a finding that the defendant acted with premeditation. Viewing the evidence in the light most favorable to the State, the evidence establishes that when the appellant and the victim saw each other on the day of the incident, they were "looking at each other real funny." Later that day, the appellant asked the victim for a "hit" off of his cigar and the victim refused. Tavarous Woods testified that the appellant told him he was "going [to] get that man" when the two saw the victim walking home from Arby's. The State introduced evidence that the appellant was armed with a 9 mm handgun. Furthermore, the appellant admitted shooting the victim with his 9 mm handgun, although he claimed that he did so only after the victim pulled a gun on him. There was no additional evidence submitted showing that the victim was armed with a handgun. In fact, the evidence indicated that no gun was recovered from the scene or from the person of the victim. The victim was shot in the back of the head, the back, and the elbow. We conclude that the evidence supports the jury's decision that the appellant committed first degree murder.

## Conclusion

After thoroughly reviewing the record before this Court, we conclude that there is no reversible error and accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE